Opinion
 

 KLEIN, P. J.
 

 The People of the State of California (the People) petition this court for a writ of mandate directing respondent superior court to vacate its order declaring defendant and real party in interest Alonzo Blakely’s (Blakely) diagnosis of “Axis II antisocial personality disorder” as a matter of law does not qualify as a “mental disease, defect, or disorder” within the meaning of Penal Code section 1026.5, subdivision (b)(1). The People seek to mandate the trial court to proceed to trial on their petition for extended commitment of Blakely.
 
 [1]
 

 The People’s petition is meritorious because the trial court’s order was erroneous. Whether a defendant “by reason of a mental disease, defect, or
 
 *205
 
 disorder represents a substantial danger of physical harm to others” under section 1026.5 is a question of fact to be resolved with the assistance of expert testimony.
 
 (People
 
 v.
 
 Superior Court
 
 (Williams) (1991) 233 Cal.App.3d 477, 489-491 [284 Cal.Rptr. 601].) Therefore, the question of whether a diagnosis of Axis II antisocial personality disorder qualifies as such a mental condition under section 1026.5 is a question of fact.
 

 Further, the trial court’s ruling the lack of effective treatment for Blakely’s mental condition precludes any extended commitment under section 1026.5 also is contrary to law. The state is not obligated to release confined individuals who are both mentally ill and dangerous “simply because they could not be successfully treated for their afflictions. [Citations.]”
 
 (Kansas
 
 v.
 
 Hendricks
 
 (1997) 521 U.S. _, _ [117 S.Ct. 2072, 2084, 138 L.Ed.2d 501, 518].) Therefore, we grant the petition.
 

 Factual and Procedural Background
 

 Evidence adduced at a preliminary hearing indicated that on or about January 31, 1987, Blakely injured his wife and mother-in-law by stabbing them with a large pair of scissors.
 

 
 *206
 
 On March 20, 1990, Blakely, as part of a plea bargain, pled guilty to charges of inflicting corporal injury upon his spouse and assaulting his mother-in-law. He admitted a deadly weapon use allegation and that he had been convicted previously of a serious felony. The issue of his sanity was submitted on the reports of various doctors. Blakely was found not guilty by reason of insanity. Pursuant to section 1026, the trial court ordered Blakely confined by the Department of Mental Health. The maximum term of confinement was computed to conclude on January 16, 1997.
 

 In August of 1996, the Department of Mental Health requested the District Attorney of Los Angeles County to file a petition for extension of Blakely’s commitment, based on a determination by the treatment staff at Atascadero State Hospital (Atascadero) that Blakely represented a substantial danger of physical harm to others by reason of a mental disease, defect or disorder.
 

 On October 18, 1996, the People filed a petition to extend Blakely’s commitment pursuant to section 1026.5, subdivision (b). That section provides a person who committed a felony and is confined to a treatment facility may be recommitted for an additional two-year period, if the person “by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others.” (§ 1026.5, subd. (b)(1).) The People’s petition was supported by a psychiatric evaluation, as well as an affidavit from the medical director at Atascadero, stating Blakely required an extension of commitment in that his mental condition rendered him dangerous to others.
 

 1.
 
 The “pretrial” motion and hearing thereon.
 

 Blakely brought a “pretrial” motion, purportedly under Evidence Code section 402, requesting the trial court to determine whether his diagnosis of Axis II antisocial personality disorder constitutes a mental disease, defect or disorder within the meaning of section 1026.5. The trial court proceeded to conduct an evidentiary hearing to determine the significance of said diagnosis and received expert testimony on the issue. It was stipulated Blakely has a disorder which is characterized as an antisocial personality disorder within the criteria set forth in the American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994) or DSM-IV, section 301.7.
 
 [2]
 

 Ronald Markman, M.D., J.D., a forensic psychiatrist called by Blakely, expressed no opinion as to whether Blakely suffers from a mental disease,
 
 *207
 
 defect or disorder within the meaning of section 1026.5, in that “the terms ‘mental disease,’ ‘disorder,’ and ‘defect’ don’t correspond to the same terms in psychiatry.”
 

 However, Markman opined that under
 
 Foucha
 
 v.
 
 Louisiana
 
 (1992) 504 U.S. 71 [112 S.Ct. 1780, 118 L.Ed.2d 437], a diagnosis of antisocial personality disorder is insufficient to maintain continued confinement of an individual. Markman further testified there is no effective treatment for antisocial personality disorder other than incarceration. According to Mark-man, Blakely “had achieved maximum hospital benefits and . . . there was no basis for further hospitalization other than for incarceration purposes.” With respect to whether Blakely, age 42, poses a danger to others, Markman opined “[t]he antisocial personality, as ... he or she gets older, is less prone to acting out and violent manners, although the risk is still there."
 
 [3]
 

 In turn, Kaushal Sharma, M.D., the People’s expert, opined antisocial personality disorder does not qualify as a disease, but it is a disorder, albeit an untreatable one. Therefore, if Blakely remained in a psychiatric hospital “there would be an attempt at treatment because if he’s in a hospital setting, I believe they are at least psychiatrically and morally required to provide some treatment. But overall, in my opinion, treatment would be a sham. I think it would be really warehousing him and trying to change his behavior with little or no success and hoping that somehow something will change.”
 

 2.
 
 Trial court’s ruling.
 

 After hearing from the above witnesses and receiving oral argument by counsel, the trial court granted Blakely’s motion. It stated: “Until the Supreme Court either of the United States or California rules differently, it’s this Court’s view preventive detention ... is the exception, not the rule in this country.” Then, the trial court erroneously equated the standard for
 
 *208
 
 insanity with the standard for an extension of commitment,
 
 [4]
 
 stating: “[I]f preventive detention is the exception and antisocial personality disorder is not the kind of disorder which would justify a finding of not guilty by reason of insanity, then it seems to the Court that an antisocial personality disorder does not fulfill the criteria of mental disease, defect, or disorder as used in section 1026.5(b).”
 

 Thereafter, as explained below, the trial court misread
 
 Foucha
 
 v.
 
 Louisiana, supra,
 
 504 U.S. 71, as stating the proposition a diagnosis of antisocial personality disorder, standing alone, is an insufficient basis for commitment. The trial court acknowledged
 
 People
 
 v.
 
 Superior Court (Williams), supra,
 
 233 Cal.App.3d at page 490, had held an antisocial personality disorder represents a mental disorder within the meaning of section 1026.5. However, the trial court found
 
 Foucha
 
 v.
 
 Louisiana, supra,
 
 504 U.S. 71, is overriding authority to the contrary.
 

 The trial court further observed “[t]he duration of commitment in this case is potentially a lifetime commitment renewable every two years. It’s clear from the testimony in this court that the disorder which Mr. Blakely is diagnosed with is essentially not successfully treatable by current methods of treatment, and that unless the courts are willing to say that preventive detention for purposes of protecting society constitutes a sufficient constitutional basis for continued confinement, it’s this court’s view antisocial personality disorder, in and of itself, cannot fulfill the criteria of a . . . ‘disorder,’ ... as used ... in [section] 1026.5(b).”
 
 [5]
 

 The trial court subsequently attempted to clarify its ruling in a written order to the effect it had not made an “evidentiary ruling regarding the
 
 *209
 
 Petition, but rather a pretrial ruling on [an] issue of law.”
 
 [6]
 
 The trial court further determined the “People are unable to proceed on this matter at this time as a result of court’s finding . . . and that [the] People have no other basis for the extension [of commitment].” The trial court then stayed Blakely’s release pending the completion of appellate proceedings.
 

 3.
 
 Subsequent proceedings.
 

 The People filed the instant petition to obtain review of the trial court’s order. They seek a trial to establish that by reason of a mental disease, defect or disorder, namely, antisocial personality disorder, Blakely represents a substantial danger of physical harm to others. (§ 1026.5.) We issued an alternative writ.
 
 [7]
 

 Contentions
 

 The People contend a diagnosis of antisocial personality disorder amounts to a mental disease, defect or disorder within the meaning of section 1026.5, subdivision (b), and therefore, if a person by reason of such mental condition represents a substantial danger of harm to others, the person may be recommitted under the statute.
 

 Discussion
 

 1.
 
 General principles.
 

 Kansas
 
 v.
 
 Hendricks, supra,
 
 521 U.S. __ [117 S.Ct. 2072, 138 L.Ed.2d 501], the latest pronouncement by the United States Supreme Court
 
 *210
 
 concerning
 
 civil
 
 commitment of the dangerously mentally ill, has illuminated this evolving area of the law.
 
 [8]
 

 It now is settled “[t]he State may take measures to restrict the freedom of the dangerously mentally ill. This is a legitimate non-punitive governmental objective and has been historically so regarded. [Citation.]”
 
 (Kansas
 
 v.
 
 Hendricks, supra,
 
 521 U.S. at p. __ [117 S.Ct. at p. 2083, 138 L.Ed.2d at p. 516].)
 

 “Although freedom from physical restraint ‘has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action,’
 
 Foucha
 
 v.
 
 Louisiana,
 
 504 U.S. 71, 80 ... , that liberty interest is not absolute. . . . ‘. . . There are manifold restraints to which every person is necessarily subject for the common good. On any other basis organized society could not exist with safety to its members.’
 
 Jacobson
 
 v.
 
 Massachusetts,
 
 197 U.S. 11, 26 . . . (1905). Accordingly, States have in certain narrow circumstances provided for the forcible civil detainment of people who are unable to control their behavior and who thereby pose a danger to the public health and safety. [Citations.] [The United States Supreme Court has] consistently upheld such involuntary commitment statutes provided the confinement takes place pursuant to proper procedures and evidentiary standards. [Citations.]”
 
 (Kansas
 
 v.
 
 Hendricks, supra,
 
 521 U.S. at p. __ [117 S.Ct. at p. 2079, 138 L.Ed.2d at pp. 511-512].)
 

 A “finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment. [The United States Supreme Court has] sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a ‘mental illness’ or ‘mental abnormality.’ [Citations.] These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control.”
 
 (Kansas
 
 v.
 
 Hendricks, supra,
 
 521 U.S. at p. __ [117 S.Ct. at p. 2080, 138 L.Ed.2d at pp. 512-513].)
 

 California’s statutory scheme embraces these dual criteria. Section 1026.5, subdivision (b), provides for an extension of commitment only if “by reason of a mental disease, defect, or disorder [the person] represents a substantial danger of physical harm to others.”
 
 [9]
 

 
 *211
 
 2.
 
 The trial court erred in holding antisocial personality disorder, as a matter of law, does not amount to a mental disease, defect, or disorder within the meaning of section 1026.5, subdivision (b).
 

 The trial court ruled that despite
 
 People
 
 v.
 
 Superior Court (Williams), supra,
 
 233 Cal.App.3d at page 490, which concluded “a . . . diagnosis of antisocial personality disorder may be substantial evidence of a mental disorder under . . . section 1026.5,” it felt constrained by
 
 Foucha
 
 v.
 
 Louisiana, supra,
 
 504 U.S. 71, to hold such a disorder does not qualify as a mental condition for purposes of the statute. The trial court erred in that
 
 Foucha
 
 does not compel such a conclusion.
 

 By way of background, in
 
 People
 
 v.
 
 Superior Court (Williams), supra,
 
 233 Cal.App.3d 477, on a petition by the People for an extension of commitment, the lower court granted nonsuit, determining that, “as a matter of law, an antisocial personality disorder is not a mental disorder within the meaning of . . . section 1026.5. In arriving at this decision, the [lower] court relied on
 
 People
 
 v.
 
 Fields
 
 [(1983)] 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680], which held that an antisocial personality disorder is not, as a matter of law, a mental disease or defect for purposes of the sanity phase of a trial. . . . The [lower] court also based its determination on the conclusion that the same criteria used to determine whether an individual is not guilty by reason of insanity should be used to determine if that individual is dangerous for purposes of extension proceedings.”
 
 (Williams, supra,
 
 233 Cal.App.3d at p. 489.) The People filed a petition for writ of mandate.
 

 Williams
 
 granted the petition, holding, inter alia, “An individual is subject to extension of his or her commitment to a state hospital where, by reason of a mental disease, defect, or disorder, he or she represents a substantial danger of physical harm to others. [Citation.] The test for extension of commitment is not the same as the test for insanity. . . . [<][] [Defendant’s] contention that a diagnosis of antisocial personality disorder is insufficient as a matter of law to support an extension is clearly without merit. First, an antisocial personality disorder is a mental disorder within the meaning of . . . section 1026.5. Second, the DSM III-R contains a detailed set of diagnostic criteria for diagnosis of an antisocial personality disorder. The
 
 *212
 
 disorder is identified by criteria other than repeated criminal and antisocial behaviors. It includes anger, unstable moods, impulsiveness, lack of remorse, inability to empathize with others, and limited frustration tolerance. Finally, all psychotherapists who testified stated that, in their opinion, [defendant] suffered from a mental disorder which caused him to be a substantial risk of harm to others. This evidence was sufficient to support a jury finding of dangerousness caused by mental disorder.
 
 The [lower] court erred in removing the issue of [defendant’s] mental disorder and dangerousness from the jury.
 
 . . . HQ
 
 We conclude that a diagnosis of antisocial personality disorder may he substantial evidence of a mental disorder under . . . section 1026.5,
 
 where the diagnosis is based on criteria in addition to repeated criminal or antisocial behavior.”
 
 (People
 
 v.
 
 Superior Court (Williams), supra,
 
 233 Cal.App.3d at pp. 490-491, italics ours, original italics deleted.)
 
 [10]
 

 The following year, in
 
 Foucha
 
 v.
 
 Louisiana, supra,
 
 504 U.S. 71, the United States Supreme Court held unconstitutional a Louisiana law “which permitted] the indefinite detention of insanity acquitees who are not mentally ill but who do not prove they would not be dangerous to others. [Fn. omitted.]”
 
 (Id.,
 
 at p. 83 [112 S.Ct. at p. 1787].)
 

 In summarizing the evidence,
 
 Foucha
 
 stated, “[h]ere, according to the testimony given at the hearing in the [lower] court, Foucha is
 
 not
 
 suffering from a mental disease or illness.”
 
 (Foucha
 
 v.
 
 Louisiana, supra,
 
 504 U.S. at p. 79 [112 S.Ct. at p. 1785], italics added.) Therefore, Louisiana did
 
 “not
 
 contend that Foucha was mentally ill at the time of the trial court’s hearing.”
 
 (Id.,
 
 at p. 78 [112 S.Ct. at p. 1784], italics added.) Instead, Louisiana sought “to perpetuate Foucha’s confinement [at a mental institution] on the basis of his antisocial personality which, as evidenced by his conduct at the facility, the [lower] court found rendered him a danger to himself or others.”
 
 (Ibid.)
 
 Louisiana “claim[ed] that it may continue to confine Foucha, who is
 
 not
 
 now considered to be mentally ill, solely because he is deemed dangerous, but without assuming the burden of proving even this ground for confinement by clear and convincing evidence.”
 
 (Id.,
 
 at p. 86 [112 S.Ct. at pp. 1788-1789], italics added.)
 

 Foucha
 
 found “at least three difficulties with this position. First, even if his continued confinement were constitutionally permissible, keeping
 
 *213
 
 Foucha against his will in a mental institution is improper absent a determination in civil commitment proceedings of
 
 current
 
 mental illness and dangerousness. . . .
 
 Here, according to the testimony given at the hearing in the [lower] court, Foucha is not suffering from a mental disease or illness.
 
 If he is to be held, he should not be held as a mentally ill person. [Citations.] [*]Q Second, if Foucha can no longer be held as an insanity acquittee in a mental hospital, he is entitled to constitutionally adequate procedures to establish the grounds for his confinement. ... ['ID Third, ‘the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions, “regardless of the fairness of the procedures used to implement them.” ’ [Citations.]”
 
 (Foucha
 
 v.
 
 Louisiana, supra,
 
 504 U.S. at pp. 78-80 [112 S.Ct. at pp. 1784-1785], italics added.)
 

 In sum, in
 
 Foucha
 
 “the State [did] not claim that Foucha [was] now mentally ill”
 
 (Foucha
 
 v.
 
 Louisiana, supra,
 
 504 U.S. at p. 80 [112 S.Ct. at p. 1986]), only that he had an “antisocial personality.”
 
 (Id.,
 
 at p. 78 [112 S.Ct. at p. 1784].) Therefore,
 
 Foucha
 
 does not address whether a diagnosis of antisocial personality disorder may constitute a mental disorder for purposes of an extended commitment. Hence, the trial court erred here in ruling as a matter of law that defendant Foucha’s “antisocial personality”
 
 (ibid.),
 
 which the evidence therein showed was
 
 not
 
 a mental disease
 
 (id.,
 
 at p. 75 [112 S.Ct. at pp. 1782-1783]), is synonymous with Blakely’s psychiatric diagnosis of Axis II antisocial personality disorder.
 

 It is “axiomatic, of course, that a decision does not stand for a proposition not considered by the court.
 
 (People
 
 v.
 
 Myers
 
 (1987) 43 Cal.3d 250, 265, fn. 5 [233 Cal.Rptr. 264, 729 P.2d 698];
 
 Ginns
 
 v.
 
 Savage
 
 (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].)”
 
 (People
 
 v.
 
 Harris
 
 (1989) 47 Cal.3d 1047, 1071 [255 Cal.Rptr. 352, 767 P.2d 619].) Consequently,
 
 Foucha
 
 does not stand for the proposition a diagnosis of antisocial personality disorder as a matter of law is insufficient to warrant an extended commitment. Therefore, the trial court’s reading of
 
 Foucha
 
 was erroneous.
 

 Accordingly, the issue of whether Blakely suffers from a mental disease, disorder or defect which renders him a danger to others (§ 1026.5, subd. (b)(1)) is not a question of law, but rather one for the trier of fact to be resolved with the assistance of expert testimony. (§ 1026.5, subd. (b)(7);
 
 People
 
 v.
 
 Superior Court (Williams), supra,
 
 233 Cal.App.3d at pp. 489-491.)
 
 [11]
 

 
 *214
 
 3.
 
 The lack of an effective treatment for Blakely’s condition is not grounds for his release.
 

 The next issue is the legal impact of the lack of any effective treatment for Blakely’s diagnosed mental condition.
 
 Kansas
 
 v.
 
 Hendricks, supra,
 
 521 U.S __ [117 S.Ct. 2072, 138 L.Ed.2d 501], readily resolves the question.
 

 In making its ruling, the trial court herein observed Blakely’s disorder “is essentially not successfully treatable by current methods of treatment, and that unless the courts are willing to say that preventive detention for purposes of protecting society constitutes a sufficient constitutional basis for continued confinement, it’s this court’s view antisocial personality, in and of itself, cannot fulfill the criteria of a, quote, ‘disorder,’ ... as used ... in [section] 1026.5(b).”
 

 The trial court’s ruling missed the mark. The law does not require release of one who is both mentally ill and dangerous merely because psychiatry has not yet developed an effective treatment for that individual’s condition. California courts repeatedly have held amenability to treatment is not a condition of extending commitment pursuant to section 1026.5.
 
 (People
 
 v. Goff (1981) 127 Cal.App.3d 1039, 1046-1048 [179 Cal.Rptr. 190];
 
 People
 
 v.
 
 Bennett
 
 (1982) 131 Cal.App.3d 488, 494-496 [182 Cal.Rptr. 473];
 
 People
 
 v.
 
 Buttes
 
 (1982) 134 Cal.App.3d 116, 120-124 [184 Cal.Rptr. 497].)
 

 Further, as noted,
 
 Kansas
 
 v.
 
 Hendricks, supra,
 
 521 U.S. __ [117 S.Ct. 2072, 138 L.Ed.2d 501], also speaks to the issue. “[U]nder the appropriate circumstances and when accompanied by proper procedures, incapacitation may be a legitimate end of the civil law. [Citation.] . . . While we have upheld state civil commitment statutes that aim both to incapacitate and to treat, [citation],
 
 we have never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others.
 
 A State could hardly be seen as furthering a ‘punitive’ purpose by involuntarily confining persons afflicted with an untreatable, highly contagious disease. Accord
 
 Compagnie Francaise de Navigation a Vapeur
 
 v
 
 Louisiana Bd. of Health,
 
 186 US 380 [22 S.Ct. 811, 46 L.Ed. 1209] (1902) (permitting involuntary quarantine of persons suffering from communicable diseases). Similarly, it would be of little value to require treatment as a precondition for civil confinement of the dangerously insane when no acceptable treatment existed. To conclude otherwise would obligate a State to release certain confined individuals who were both
 
 *215
 
 mentally ill and dangerous simply because they could not be successfully treated for their afflictions. Cf.
 
 Greenwood
 
 v
 
 United States,
 
 350 U.S. 366, 375 [76 S.Ct. 410, 100 L.Ed. 412], (1956) (‘The fact that at present there may be little likelihood of recovery does not defeat federal power to make this initial commitment of the petitioner’);
 
 O’Connor
 
 v
 
 Donaldson,
 
 422 U.S. 563, 584 [95 S.Ct. 2486, 45 L.Ed.2d 396], (1975) (Burger, C. J., concurring) (‘[I]t remains a stubborn fact that there are many forms of mental illness which are not understood, some [of] which are unbeatable in the sense that no effective therapy has yet been discovered for them, and that rates of “cure” are generally low’).’’
 
 (Kansas
 
 v.
 
 Hendricks, supra,
 
 521 U.S. at p. __ [117 S.Ct. at p. 2084, 138 L.Ed.2d at pp. 517-518.)
 

 Accordingly, Blakely’s lack of amenability to beatment does not preclude an extension of his commitment.
 

 4.
 
 The task of the trier of fact on remand.
 

 For the reasons set forth above, the People are entitled to a trial on their petition for extended commitment of Blakely. The issues of whether Blakely’s diagnosis of Axis II antisocial personality disorder amounts to a mental disease, defect or disorder, and whether by reason of such mental condition, Blakely poses a substantial danger of physical harm to others, are to be resolved by the trier of fact. (§ 1026.5, subd. (b)(1);
 
 People
 
 v.
 
 Superior Court (Williams), supra,
 
 233 Cal.App.3d at p. 490.)
 

 “Whether the individual is mentally ill and dangerous to . . . others and is in need of confined therapy turns on the meaning of the facts which must be interpreted by expert psychiabists and psychologists.”
 
 (Addington
 
 v.
 
 Texas
 
 (1979) 441 U.S. 418, 429 [99 S.Ct. 1804, 1811, 60 L.Ed.2d 323], italics deleted.) Consistent therewith, the instant statutory scheme contemplates that in said proceeding, the trier of fact shall be aided by the expert testimony of psychologists or psychiatrists. (§ 1026.5, subd. (b)(7).) Other relevant evidence bearing on the issues of Blakely’s mental disorder and dangerousness may include, inter alia, previous instances of violent behavior
 
 (Kansas
 
 v.
 
 Hendricks, supra,
 
 521 U.S. at p. __ [117 S.Ct. at pp. 2079-2080,138 L.Ed.2d at p. 512]), as well as the determination of the beatment staff at Atascadero, Blakely’s behavior at that facility and psychiatric evaluations.
 

 5.
 
 The People’s burden of proof.
 

 To guide the trial court on remand (Code Civ. Proc., § 43), we also address the People’s burden of proof under section 1026.5.
 

 The United States Supreme Court repeatedly has held due process requires the state in a civil commitment proceeding to demonsbate by
 
 clear and convincing evidence
 
 that the person is mentally ill and dangerous.
 
 (Addington
 
 
 *216
 
 v.
 
 Texas, supra,
 
 441 U.S. at pp. 425-433 [99 S.Ct. at pp. 1808-1813];
 
 Jones
 
 v.
 
 United States
 
 (1983) 463 U.S. 354, 362 [103 S.Ct. 3043, 3048, 77 L.Ed.2d 694];
 
 Foucha
 
 v.
 
 Louisiana, supra,
 
 504 U.S. at p. 80 [112 S.Ct. at pp. 1785-1786].) However, the states are not precluded from adopting a more stringent standard of proof.
 
 (Addington
 
 v.
 
 Texas, supra,
 
 at pp. 430-431 [99 S.Ct. at pp. 1811-1812].)
 

 California courts have construed section 1026.5 as imposing upon the state the higher standard of proof beyond a reasonable doubt.
 
 People
 
 v.
 
 Buttes, supra,
 
 134 Cal.App.3d at page 125, holds “the burden of proof is placed on the prosecution to prove
 
 beyond a reasonable doubt
 
 the two conditions required for an extended commitment,” i.e. mental illness and dangerousness. (Italics added.)
 
 People
 
 v.
 
 Wilder
 
 (1995) 33 Cal.App.4th 90, 98 [39 Cal.Rptr.2d 247], is in accord.
 

 Section 1026.5 has been amended no less than four times—in 1984, 1985, 1991 and 1994—since the
 
 Buttes
 
 court held the standard of proof in extension proceedings is proof beyond a reasonable doubt.
 
 [12]
 
 It is well settled that “ ‘[statutes are to be interpreted by assuming that the Legislature was aware of the existing judicial decisions. [Citation.] Moreover, failure to make changes in a given statute in a particular respect when the subject is before the Legislature, and changes are made in other respects, is indicative of an intention to leave the law unchanged in that respect.’ [Citations.]”
 
 (Bishop
 
 v.
 
 City of San Jose
 
 (1969) 1 Cal.3d 56, 65 [81 Cal.Rptr. 465, 460 P.2d 137].) Thus,
 
 Buttes
 
 is still the governing law on this point in view of the Legislature’s inaction with respect to the
 
 Buttes
 
 interpretation of section 1026.5.
 

 Also relevant here is Welfare and Institutions Code section 6604, pertaining to the extended commitment of sexually violent predators. With respect to the People’s burden of proof, that statute provides: “The court or jury shall determine whether,
 
 beyond a reasonable doubt,
 
 the person is a sexually violent predator. If the court or jury is not satisfied
 
 beyond a reasonable doubt
 
 that the person is a sexually violent predator, the court shall direct that the person be released at the conclusion of the term for which he or she was initially sentenced, or that the person be unconditionally released at the end of parole, whichever is applicable. If the court or jury determines that the person is a sexually violent predator, the person shall be committed for two years to the custody of the State Department of Mental Health for appropriate treatment and confinement in a secure facility . . . and the person shall not be kept in actual custody longer than two years unless a subsequent
 
 *217
 
 extended commitment is obtained from the court incident to the filing of a new petition for commitment under this article or unless the term of commitment changes pursuant to subdivision (e) of Section 6605.” (Welf. & Inst. Code, § 6604, italics added.)
 
 [13]
 

 Thus, the statutory scheme governing the extended commitment of sexually violent predators (Welf. & Inst. Code, § 6600 et seq.) is analogous to the extended commitment of the dangerous mentally ill pursuant to section 1026.5. Where “personal liberty is at stake, ... the applicable standard for measuring the validity of the statutory scheme . . . requires application of the strict scrutiny standard of equal protection analysis.”
 
 (In re Moye
 
 (1978) 22 Cal.3d 457, 465 [149 Cal.Rptr. 491, 584 P.2d 1097].) Accordingly, there must be a “ ‘compelling interest’ ” to justify a lower standard of proof for extended commitment under section 1026.5 than under Welfare and Institutions Code section 6604.
 
 (In re Moye, supra,
 
 at p. 465.) There is no conceivable basis for requiring a lesser showing by the People for the extended commitment of the dangerous mentally ill than for the extended commitment of sexually violent predators.
 

 Accordingly, to obtain an extended commitment under section 1026.5, the People are required to meet the “beyond a reasonable doubt” standard of proof.
 

 Disposition
 

 The alternative writ having served its purpose is discharged. Let a peremptory writ of mandate issue directing respondent superior court to vacate its pretrial order declaring Blakely’s diagnosis as a matter of law does not qualify as a mental disease, defect or disorder under section 1026.5, subdivision (b)(1), and to proceed to trial on the People’s petition for extended commitment, guided by the principles set forth herein.
 

 Croskey, J., and Kitching, J., concurred
 

 The petition of real party in interest for review by the Supreme Court was denied April 1, 1998. Mosk, J., and Werdegar, J., were of the opinion that the petition should be granted.
 

 [1]
 

 Penal Code section 1026.5 provides in relevant part: “(b)(1) A person may be committed beyond the term prescribed by subdivision (a) only under the procedure set forth in this subdivision and only if the person has been committed under Section 1026 for a felony
 
 and by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others.
 
 [<1 (2) Not later than 180 days prior to the termination of the maximum term of
 
 *205
 
 commitment prescribed in subdivision (a), the medical director of a state hospital in which the person is being treated, . . . shall submit to the prosecuting attorney his or her opinion as to whether or not the patient is a person described in paragraph (1). . . . The prosecuting attorney may then file a petition for extended commitment in the superior court which issued the original commitment. . . . The petition shall state the reasons for the extended commitment, with accompanying affidavits specifying the factual basis for believing that the person meets each of the requirements set forth in paragraph (1). [1 (3) When the petition is filed, the court shall advise the person named in the petition of the right to be represented by an attorney and of the right to a jury trial. The rules of discovery in criminal cases shall apply. . . . fid (4) The court shall conduct a hearing on the petition for extended commitment. The trial shall be by jury unless waived by both the person and the prosecuting attorney. . . . HD . . . HD (7) The person shall be entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings. All proceedings shall be in accordance with applicable constitutional guarantees. . . . Appointment of necessary psychologists or psychiatrists shall be made in accordance with this article and Penal Code and Evidence Code provisions applicable to criminal defendants who have entered pleas of not guilty by reason of insanity. HD (8) If the court or jury finds that the patient is a person described in paragraph (1), the court shall order the patient recommitted to the facility in which the patient was confined at the time the petition was filed. This commitment shall be for an additional period of two years from the date of termination of the previous commitment, and the person may not be kept in actual custody longer than two years unless another extension of commitment is obtained in accordance with the provisions of this subdivision. . . . HO . . . HO (10) Prior to termination of a commitment under this subdivision, a petition for recommitment may be filed to determine whether the patient remains a person described in paragraph (1). . . - HQ (11) Any commitment under this subdivision places an affirmative obligation on the treatment facility to provide treatment for the underlying causes of the person’s mental disorder.” (Italics added.)
 

 All further statutory references are to the Penal Code unless otherwise indicated.
 

 [2]
 

 There are five axes included in the DSM-IV multiaxial classification system. Personality disorders are reported in Axis II. DSM IV,
 
 supra,
 
 at p. 25.)
 

 The DSM-IV at pages 649-650 sets forth the following diagnostic criteria for section 301.7 antisocial personality disorder: “A. There is a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, as indicated by three (or more) of the following: [*1 (1) failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest [C]Q (2) deceitfulness, as
 
 *207
 
 indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure fiO (3) impulsivity or failure to plan ahead [1 (4) irritability and aggressiveness, as indicated by repeated physical fights or assaults [<]Q (5) reckless disregard for safety of self or others [<]fl (6) consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations fiO (7) lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another ffl] B. The individual is at least age 18 years. [1 C. There is evidence of Conduct Disorder (see p. 90) with onset before age 15 years. HU D. The occurrence of antisocial behavior is not exclusively during the course of Schizophrenia or a Manic Episode.”
 

 [3]
 

 Although the immediate issue before the trial court was the legal significance of Blakely’s
 
 Axis II
 
 antisocial personality disorder, Markman also testified Blakely had an
 
 “Axis
 
 7” diagnosis of polysubstance abuse including cocaine and heroin. With respect to whether Blakely is dangerous due to his Axis I diagnosis, Markman acknowledged “there’s a high recidivist risk” in terms of crimes of violence.
 

 [4]
 

 Clearly, the “test for extension of commitment is not the same as the test for insanity.”
 
 (People
 
 v.
 
 Superior Court (Williams), supra,
 
 233 Cal.App.3d at p. 490.) A defense of not guilty by reason of insanity “shall not be found by the trier of fact solely on the basis of a personality . . . disorder.” (§ 25.5.) The California test for insanity is codified in section 25, subdivision (b).
 
 (People
 
 v.
 
 Kelly
 
 (1992) 1 Cal.4th 495, 532 [3 Cal.Rptr.2d 677, 822 P.2d 385].) The inquiry is whether the accused “was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense.” (§ 25, subd. (b).)
 

 In contrast, the standard for recommitment under section 1026.5, subdivision (b), is whether a defendant, “by reason of a mental disease, defect, or disorder represents a substantial danger of physical harm to others.” (See also
 
 People
 
 v.
 
 Fields
 
 (1983) 35 Cal.3d 329, 371 [197 Cal.Rptr. 803, 673 P.2d 680], distinguishing between antisocial behavior and insanity defense;
 
 People
 
 v.
 
 Superior Court (Williams), supra,
 
 233 Cal.App.3d at pp. 489-490.)
 

 [5]
 

 The trial court simply held a diagnosis of antisocial personality disorder is an insufficient basis for commitment and therefore did not reach the issue of whether Blakely’s mental condition renders him dangerous to others. (§ 1026.5, subd. (b).)
 

 [6]
 

 We note the purpose of a hearing under Evidence Code section 402 is to decide preliminary questions of fact upon which the admissibility of evidence depends. (See generally, 3 Wilkin, Cal. Evidence (3d ed. 1986) Introduction of Evidence at Trial, § 1712 et seq., p. 1671.) Here, however, in ruling on Blakely’s motion, the trial court decided the substantive issue to be litigated at trial, namely, whether he suffers from a qualifying mental disorder within the meaning of section 1026.5.
 

 [7]
 

 Blakely contends the alternative writ was improvidently issued because the People cannot seek extraordinary review of a pretrial
 
 evidentiary
 
 ruling.
 
 (People
 
 v.
 
 Municipal Court (Ahnemann)
 
 (1974) 12 Cal.3d 658, 660 [117 Cal.Rptr. 20, 527 P.2d 372].) The argument is unavailing because it mischaracterizes the nature of Blakely’s pretrial motion and the trial court’s ruling thereon. Here, the trial court did not simply resolve an issue as to the admissibility of certain evidence. Rather, its ruling concerning the legal significance of Blakely’s diagnosis essentially disposed of the entire matter.
 

 Further, in view of the urgent nature of extension proceedings, review by way of writ of mandate is appropriate.
 
 (People
 
 v.
 
 Superior Court (Williams), supra,
 
 233 Cal.App.3d at p. 482, fn. 2.)
 

 [8]
 

 Subsequent to our issuance of the alternative writ, the United States Supreme Court decided
 
 Kansas
 
 v.
 
 Hendricks, supra,
 
 521 U.S. __ [117 S.Ct. 2072, 138 L.Ed.2d 501]. At our request, the parties submitted supplemental briefs discussing the impact of that decision on the issues presented herein.
 

 [9]
 

 The United States Supreme Court has “never required State legislatures to adopt any particular nomenclature in drafting civil commitment statutes. Rather, [it has] traditionally
 
 *211
 
 left to legislators the task of defining terms of a medical nature that have legal significance. [Citation.] As a consequence, the States have, over the years, developed numerous specialized terms to define mental health concepts. Often, those definitions do not fit precisely with the definitions employed by the medical community. The legal definitions of ‘insanity’ and ‘competency,’ for example, vary substantially from their psychiatric counterparts. [Citation.] Legal definitions, . . . which must ‘take into account such issues as individual responsibility . . . and competency,’ need not mirror those advanced by the medical profession.”
 
 (Kansas
 
 v.
 
 Hendricks, supra,
 
 521 U.S. at p. __ [117 S.Ct. at p. 2081, 138 L.Ed.2d at pp. 513-514].)
 

 [10]
 

 We note some tension between the statement in
 
 Williams
 
 that “. . . an antisocial personality disorder
 
 is a mental disorder
 
 within the meaning of. . . section 1026.5”
 
 (People
 
 v.
 
 Superior Court (Williams), supra,
 
 233 Cal.App.3d at p. 490, italics added), and its “conclusion] that a diagnosis of antisocial personality disorder
 
 may be substantial evidence of a mental disorder
 
 under . . . section 1026.5.”
 
 (Ibid.,
 
 italics added.) We understand
 
 Williams
 
 as standing for the proposition the issue of whether such a diagnosis is a mental disorder within the meaning of the statute is to be resolved by the trier of fact.
 

 [11]
 

 Blakely’s equal protection argument is meritless. He argues the People “would have this court allow for the extended] [commitment] of insanity acquittees who have no other mental malady except for antisocial personality disorder and who are dangerous.” The argument fails because “. . . a diagnosis of antisocial personality disorder may be substantial evidence of a
 
 *214
 
 mental disorder under . . . section 1026.5”
 
 (People
 
 v.
 
 Superior Court (Williams), supra,
 
 233 Cal.App.3d at p. 490), and commitment is proper where a mental disorder causes the person to be dangerous. (§ 1026.5, sub. (b)(1);
 
 Kansas
 
 v.
 
 Hendricks, supra,
 
 521 U.S. at p. __ [117 S.Ct. at pp. 2079-2081, 138 L.Ed.2d at pp. 512-513].)
 

 [12]
 

 (Stats. 1984, ch. 1488, § 5, p. 5204; Stats. 1985, ch. 1232, § 3.5, p. 4218; Stats. 1991, ch. 183, § 2, p. 1405; Stats. 1993-1994, 1st Ex. Sess. 1994, ch. 9, § 1; see Historical Note, 50A West’s Ann. Pen. Code (1985 ed.) foll. § 1026.5, pp. 663-664; Historical and Statutory Notes, 50A West’s Ann. Pen. Code,
 
 supra,
 
 foll. § 1026.5 (1997 pocket supp.) pp. 112-113.)
 

 [13]
 

 We observe that like Welfare and Institutions Code section 6604, the Kansas statute involved in
 
 Kansas
 
 v.
 
 Hendricks
 
 required “a trial... to determine
 
 beyond a reasonable doubt
 
 whether the individual was a sexually violent predator.”
 
 (Kansas
 
 v.
 
 Hendricks, supra,
 
 521 U.S. at p. _ [117 S.Ct. at p. 2077, 138 L.Ed.2d at p. 509], italics added.)